IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Stephen Andrew Beckham, # 236548,      )
                                       )
                                       )      Civil Action No. 6:14-4358-MGL-KFM
                          Petitioner,  )
                                       )      **REPORT OF MAGISTRATE JUDGE**
            vs.                        )
                                       )
Leroy Cartledge,                       )
                                       )
                                       )
                          Respondent.  )
_____)

The petitioner, a state prisoner represented by counsel, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Civ. Rule 73.02(B)(2)(c)(D.S.C.), this magistrate judge is authorized to review post-trial petitions for relief and submit findings and recommendations to the District Court.

## BACKGROUND

The petitioner is currently incarcerated at the McCormick Correctional Institution of the South Carolina Department of Corrections ("SCDC"). The petitioner was indicted by the Newberry County Grand Jury on January 22, 1996, for murder, conspiracy, and kidnaping involving the death of his wife, Victoria Beckham, on June 12, 1994. The State provided notice of intent to seek the death penalty pursuant to South Code Annotated § 16-3-26. The petitioner was represented by Jack B. Swerling and Richard A. Harpootlian. The matter was prosecuted by Solicitor W. Townes Jones, IV, of the Eighth Judicial Circuit and Assistant Solicitor Knox McMahon.

The petitioner proceeded to jury trial before the Honorable Henry F. Floyd, (then) South Carolina Circuit Judge, with jury selection taking place from September 14, 1996, through September 18, 1996, and the guilt phase of the jury trial commencing on September 19, 1996, through October 1, 1996.  At the conclusion of the guilt phase of the trial, the petitioner was found guilty as charged.

The penalty phase of the trial was held October 4, 1996.  At the conclusion of the penalty phase, the jury unanimously found beyond a reasonable doubt the existence of the following aggravating circumstances: (1) the murder was committed while in the commission of a kidnaping, (2) the murder was committed while the victim was subjected to physical torture, and (3) the defendant caused or directed another to commit murder, and, having found the aforementioned aggravating circumstances beyond a reasonable doubt.  The jury unanimously recommended a sentence of life imprisonment.  The petitioner was sentenced to confinement for life for murder, thirty years for kidnaping, and five years for conspiracy.

### Underlying Case Facts

On June 12, 1994, Victoria Lander Beckham was murdered.  In July 1995, Richard Anderson was arrested for her murder.  He gave police a statement implicating the petitioner, Ms. Beckham's husband, from whom she was separated.  Anderson, a bouncer from a Myrtle Beach strip bar (Smugglers), testified that the petitioner hired him to dispose of Ms. Beckham's body.  On June 12, 1994, at 6:15 p.m., Ms. Beckham dropped off the children at the petitioner's mobile home for a scheduled visitation.  The petitioner got into the car to talk with her as the children went into the home.  At the same time, Anderson waited beside a dirt road not far from the petitioner's driveway for the petitioner.  Anderson testified that as the petitioner drove up in Ms. Beckham's car, he saw the petitioner beat Ms. Beckham with a gun.  She was rendered unconscious.  Anderson testified that the petitioner told him to break Ms. Beckham's neck by striking her with a pair of bolt cutters.  He then told Anderson to drive her car to Little Mountain Road, wait until it was dark, and drive the car off of the mountain road in an attempt to make it look as if Ms. Beckham had died in a car

2

accident.  The car, however, rolled to the wrong side of the road into a ditch and Victoria Beckham's body was discovered that same night at approximately 9:15 p.m (*see* doc. 18-5). A day or two after Ms. Beckham's death, Lewis Frick, a security officer at the V.C. Sumner nuclear station, passed the murder scene on the way home from work and saw law enforcement officers parked on the side of the road (doc. 21-8, supp. app. 1516–21).  Frick stopped and told them that he passed that location on June 12 on his way to work around 6:35 or 6:40 p.m., and saw a late '70 or early '80 model Grand Prix with a bad gold or copper paint job parked nearby.  Frick noted the car and certain details about it because it was very similar to the first car he had owned (*id.* 1519).

After Ms. Beckham's murder, the petitioner's contacts with Anderson slacked off.  Anderson did not hear from the petitioner again until about two months after the murder when the petitioner called him at home and told him to "meet me outside" (doc. 21-10, supp. app. 2040–43).  The petitioner was wearing a beard, driving a different car, and said that his "bank accounts were frozen" and the "police were all over him." (*id.* 2041).[1]

In December 1994, Shawn Gehm (the DJ at Smugglers) received a letter from the petitioner telling him "not to say anything" (doc. 22-1, supp. app. 2701).  Inside that letter was another sealed letter that Gehm was supposed to give to "King Richard" Anderson (*id.* 2701, 2703).  Gehm threw his letter away and gave the other letter to Anderson[2] (*id.* 2702–03).  The petitioner also visited Gehm in December 1994 and told him not to talk to anyone or give any information (*id.* 2704–05).  The petitioner asked Gehm if he had delivered the letter to Anderson (*id.* 2705–06).

---

[1] The trial transcript in the supplemental appendix appears in all capital letters.  In this Report and Recommendation, the citations to the supplemental appendix use the pagination of the supplemental appendix, not the CM-ECF pagination.

[2] Anderson confirms receiving this letter (doc, 21-10, supp. app. 2043).  " [I]t was a note that was written, it was pretty much telling me, you know, to keep my mouth shut, to -- if I needed to get in contact with him, it said to get in touch with somebody that we both knew.  The man's name was Jerry Hogan, up in Greensboro or something, at a club called 'Cherry's.'"  It said on the letter to burn it, but Anderson threw it away (*id.* 2044).

In the spring of 1995, the petitioner called Anderson at home. Anderson agreed to meet the petitioner at a store across from the apartment complex where Anderson lived[3] (doc. 21-10, supp. app. 2045). The petitioner told Anderson the police thought that the petitioner committed the murder and they were looking for the car Anderson was driving on the night of the murder. The petitioner also suggested that Anderson "get out of dodge" (*id.* 2046).

In April or May 1995, South Carolina Law Enforcement Division ("SLED") Agent "Spike" McCraw was assigned to the case and, after reviewing the file, subpoenaed additional telephone and bank records. (doc. 22-2, supp. app. 2929). The telephone records showed calls to and from various locations in the Myrtle Beach area, including Smuggler's (*id.* 2929–46). Bank records also showed financial transactions in the Myrtle Beach area (*id.* 2964–71). Consequently, Agent McCraw visited Smuggler's and observed a vehicle matching the description of the car seen on the side of the road by Mr. Frick and determined that it was owned by Michael Beatty, Jr., the manager of Smuggler's, and that Anderson had access to the car (*id.* 2972–73). McCraw interviewed Anderson on June 26, 1995, and July 7, 1995 (*id.* 2973–74). The interview on June 26, 1995, took place in Columbia (*id.* 2974). SLED personnel requested that Anderson return the next day for further inquiry, but Anderson did not return until July 7, 1995. During the interview on July 7, 1995, Anderson took police to several locations and showed them physical evidence that connected him with the murder of Victoria Lander Beckham (*id.* 2975–82). Anderson also gave a statement detailing his involvement in the murder and implicating the petitioner (doc. 21-11, supp. app. 2231–32, 2236–44).

In July 1995, Gehm received a letter from the petitioner (doc. 22-1, supp. app. 2707). The letter stated as follows:

> Dear Shawn, I hope you are doing good. Things have been
> hell here. They have been telling lies and doing anything to

---

[3] At trial, Anderson's girlfriend, Tammy McKinney, confirmed this meeting (doc. 22-1, supp. app. 2800–02).

> trash me.  I heard from an investigator that they have zero and
> so they are telling people that they have a bunch of evidence to
> try and spook someone into saying something, even if it's not
> true.  I will try and see you sometime soon.  Tell anyone who
> gets bothered that I'm sorry these guys are so desperate and
> full of shit.  It doesn't seem like we are in America with some of
> the crap they are pulling. . . .

(*Id*. 2709–10).  Anderson was arrested on July 10, 1995.  On July 11, 1995, an arrest warrant was issued for the petitioner, who had left with his family on a trip to Florida (doc. 22-6, supp. app. 3894–96; doc. 22-8, supp. app. 4333, 4340, 4343).

On July 15, 1995, Lexington County Sheriff's deputies were dispatched to a possible overdose at the St. Francis of Assisi Episcopal Church on Old Lexington Road just outside Chapin, South Carolina.  When deputies arrived, they found the petitioner seated in the back seat of Reverend Robert Libby's Ford LTD (doc. 22-5, supp. app. 3634–44).  After questions from a law enforcement officer relating to the petitioner's identity (*id*. 3639–44), the petitioner was arrested and transported to the hospital (*id.* 3645).  At trial, the State presented evidence that the petitioner solicited two different men (Anderson and Rick Mitchell) on two separate occasions to assist with the murder of his wife and then attempted to cover his tracks.

***Trial***

The petitioner's trial was held from September 19, 1996, through October 4, 1996.  During cross-examination of Agent McCraw, the petitioner's counsel attempted through numerous questions to infer that two people were seen on Mountain Road (doc. 22-2, supp. app. 3017–39).  When Agent McCraw testified "I don't know anyone I could have told that I was looking for two people, because I didn't know," the petitioner sought to introduce an affidavit for a search warrant that Agent McCraw had signed to impeach his testimony (*id*. 3039). After considerable argument and a proffer on the issue (*id*. 3039–81), the trial judge ruled that the affidavit would not be admitted on the ground that it was an effort to point to third party guilt (*id*. 3058, 3066–67, 3075).

5

The petitioner also sought to introduce evidence - a composite drawing - concerning a man that witnesses saw on Little Mountain Road on the evening of June 12, 1994, at a time when the petitioner could not have been there. The drawing was not a picture of the petitioner or Richard Anderson. At least one person said the composite resembled Michael Beatty. The drawing was also excluded as it was offered as evidence of third party guilt (*id*. 2960).

James Suber, the petitioner's nephew, also testified at trial to attack the integrity of the police investigation by showing bias, prejudice, and state of mind (doc. 22-7, supp. app. 4138, 4160–85). Suber testified, *in camera*, that officers came to him and told him that the petitioner had already confessed and that he had implicated Suber as his accomplice (*id*. 4164–67). He claimed that the officers had told him that he should go ahead and confess because the petitioner had confessed and told them everything. According to the petitioner, this evidence should have been admitted to show the bias of law enforcement. The trial judge ruled that the evidence was not admissible because it was not relevant, was not proper character evidence, and did not fall within Rule 803(3) (*id*. 4185–86).

During the trial, Rick Mitchell (a/k/a "Slick Rick") testified that he was a bouncer at Smuggler's in the late 1980's. He testified that he knew Richard Anderson from Smuggler's (doc. 22-4, supp. app. 3368–69). In 1992, Mitchell was sent to prison for accessory after the fact of murder and drug charges (*id*. 3369–73). Mitchell testified that after he was released from prison, he returned to Myrtle Beach and was approached by the petitioner. Mitchell testified that the petitioner asked him to kill his wife and gave him an old army rifle to do the job (*id*. 3373–77). Mitchell testified that the petitioner gave him an address for Victoria Beckham and a picture of her. During his testimony, he could not recall the address, but testified that he did remember that he was told that Ms. Beckham's house had a long driveway. Mitchell testified that the petitioner gave him the date of a weekend when Ms. Beckham would be at her home alone (*id*. 3377–79). Mitchell further testified that

after this meeting he destroyed the photograph and the address and left the rifle in the trailer.  He stated he wanted "nothing else to do with what was going on" (*id*. 3379).

The petitioner sought to admit evidence of ten telephone calls from July and August 1996 (two years after the murder) from Rick Mitchell's residence to Myrtle Beach and one collect phone call on August 3rd at 11:23 a.m. to the Gentlemen's Club from an unknown phone in Anderson, South Carolina.  Mitchell's wife lives in Anderson, South Carolina, and the petitioner also sought to introduce evidence that a collect call from Anderson was accepted by someone at the Gentleman's Club, formerly known as Smuggler's.  The defense contended that these calls were offered to impeach Rick Mitchell's testimony that he had had no contact with the "old gang" for over a year prior to trial (doc. 22-4, supp. app. 3418; doc. 22-9, supp. app. 4711–46).  Counsel urged that these calls were relevant on the issue of Mitchell's credibility (*id*. 4713, 4725).  Judge Floyd excluded evidence of the calls (*id*. 4725).  Judge Floyd found that there was nothing in the phone records that showed that Mitchell talked to anyone who knew anything about the case (*id*.).  The court also excluded a call that went to Smuggler's because it was not tied to Mitchell's number (*id*.).  Judge Floyd also opined that Mitchell had already been impeached with inconsistencies in his statements: "And I, frankly, think that once you're impeached, you're impeached" (doc. 22-9, supp. app. 4726).

The petitioner's trial was a very high profile case.[4]  The trial court sequestered the jury.  The court requested a sequestration team of SLED agents from the Lowcountry who were not connected to the investigation of the crime (doc. 20-9, app. 2219–22).  Judge Floyd ordered SLED to maintain a record "of agents' assignments to shifts and duty stations . . ."  The SLED personnel "shall make certain that no member of the jury has unauthorized contact with any outside person" (*id*. 2222).  In his *de bene esse* deposition of October 28, 2010, Judge Floyd testified that a record of people authorized to be in the area of the jurors'

---

[4]At the time of the murder, the petitioner's father was the Bishop of the Episcopal Diocese of Upper South Carolina and the deceased victim's father was a state senator (doc. 20-11, app. 2499; doc. 20-12, app. 2521).

quarters would be helpful, because, if an incident occurred, then they might be witnesses (doc. 20-11, app. 2479–80). Judge Floyd testified that Captain Charlie Webber[5] was the head of the sequestration team (*id.* 2480–81). Judge Floyd testified that his understanding was that Captain Webber would respond to him, and the sequestration team would respond to Captain Webber (*id.* 2481-82). Judge Floyd expected Captain Webber to bring to his attention "anything that would affect the outcome of the trial," such as inappropriate comments, premature discussion, or an illness (*id.* 2481).

Juror Jack Galbreath testified during the PCR evidentiary hearing that, upon returning to the hotel after the first day of trial (September 19, 1996), he noticed his suitcase had been gone through. He also noticed that his clothes, which were usually folded, were "just scattered all through the suitcase." Nothing was missing, and there was no indication of any forced entry into the hotel room (doc. 20-7, app. 1544, 1561). Galbreath noted that he travels frequently, that this had happened to him before, and that he usually tells the hotel manager (doc. 20-6, app. 1543–44). In this case, he immediately reported the incident to SLED Agent Barry. Galbreath asked Agent Barry if any of the agents searched his room while the jurors were at court (*id.* 1545, 1555). According to juror Galbreath, Agent Barry told him no and Galbreath was told that Agent Barry called the judge. Another SLED agent, Natalie Talbert, was sent from Greenwood to investigate (*id.* 1545, 1554–55). Other jurors knew Galbreath was upset (*see* doc. 20-9, app. 2093–97; doc. 20-6, app. 1601–02; doc. 21, app. 3475–76).

At the direction of Agent Barry, Agent Mears took a statement from Galbreath about the incident. According to his report, the matter was reported to Captain Webber who asked Agent Talbert to come to the hotel to investigate. Agent Talbert was a Special Agent with SLED in the Piedmont region. She was neither involved in the investigation of the underlying case nor was she a member of the jury sequestration team during the petitioner's trial (doc. 20-8, app. 2018, 2031). The report indicates her time of arrival was 7:08 p.m.

---

[5]Captain Charles D. Webber died in 2002.

8

(doc. 20-7, app. 1688).  Galbreath testified that upon Agent Talbert's arrival at the hotel, "[s]he just looked at [his] suitcase and then asked [him] to open it up and just kind of questioned [him] about the stuff in the suitcase" (doc. 20-6, app. 1546–47).  She did not take photographs or look for fingerprints (*id*. 1547).  After spending approximately between thirty and forty-five minutes in Galbreath's room, Agent Talbert left.  Galbreath also testified that he did not believe that Agent Talbert took the situation seriously enough (*id*.; *see also* doc. 21, app. 3468–72).

Agent Barry testified that, as a team leader of the sequestration team in this case, he reported to his supervisor, Captain Webber, regarding any jury matters (doc. 20-8, app. 1904–05).  Captain Webber decided what matters would be reported to the trial court judge (*id*. 1916).  Agent Barry testified the procedures followed during the petitioner's trial were standard protocol for a jury sequestration team (doc. 20-8, app. 1909–10).  The incident with Mr. Galbreath's suitcase was not reported to Judge Floyd (doc. 20-11, app. 2493–94).[6]  Judge Floyd was not aware that the responding agent (Talbert) worked in the Piedmont region (*id*.; doc. 20-12, app. 2504; doc. 21, app. 3472–74).

About a week after the first incident, Galbreath testified that his suitcase was searched a second time (doc. 20-6, app. 1548–49).  After this second incident, Galbreath went to the forelady of the jury, Alice Lamar, and made it clear to her that if his suitcase was rifled through again he would leave the jury because he "wasn't going to stand for it" (*id*. 1548).  When asked why he did not report this second incident to SLED, he responded, "Because I felt like they didn't take it serious the first time" (*id*.; *see also* doc. 21, app. 3469). Juror Lamar recalled that Galbreath came to her after "his bags had been searched."  She testified, "He came to me, said that he knew that his bag had been disturbed and it was not exactly how he had left it."  After Galbreath told her about the search, Lamar thinks she "told one of the SLED agents" (doc. 20-6, app. 1569).  Lamar conducted her own investigation of the incident by interviewing the other jurors individually.  She "asked the other jurors if

---

[6]Judge Floyd's *de bene esse* deposition dated October 28, 2010, is located at docs. 20-11 and 20-12, app. 2460–2580.

there had been anything that they had noticed and nobody had" (*id*. 1572).  Lamar specifically asked the jurors, "[H]ave you noticed or have you had any problems, anything about your luggage or anything of that sort or anything disturbed in your possessions" (*id*. 1572).  She did not recall telling SLED agents about her investigation (*id*. 1572–75; *see also* doc. 21, app. 3475, 3499–3500).[7]

A similar incident, involving juror Edna Capps, took place on September 22, 1996, but was not reported until the next morning.  She reported that some of her undergarments were missing from her hotel room (doc. 20-9, app. 2236 [incident report]; doc. 21, app. 3480–81).  The parties were unable to locate Juror Capps prior to the PCR hearing; however, other witnesses testified about the incident.  Juror Galbreath recalled hearing that another juror had their hotel room entered and there were some items missing from the suitcase, but he did not recall who told him about the incident.  He did not know if anyone investigated it (doc. 20-6, app. 1548–49; *see also* doc. 21, app. 3481).  When asked what he recalled about the incident, Agent Rudloff stated, "It was brought to my attention that a juror, a female juror, had had a problem with apparently somebody going in her room and rummaging through her clothes and I went and took a report on that." (doc. 20-7, app. 1733).  After turning the report over to his team leader Agent Barry, Agent Rudloff was not asked to conduct any further investigation (*id*. 1734–35).  He assumed Agent Barry took the report "up the chain of command" (*id*. 1734).  Agent Bobby Jenkins[8] also thought Agent Barry would have reported the incident to Captain Webber.  This incident was not reported to Judge Floyd (doc. 20-11, app. 2498; *see also* doc. 21, app. 3481–83).

---

[7]At the time of the PCR hearing on September 28–30, 2010, Juror Lamar indicated she was eighty-eight years old and that her "memory may not be as good as it ought to be." (doc. 20-6, app. 1569).

[8]Agent Jenkins took over as team leader on September 23, 1996, the day after the Capps incident.  Jenkins testified that Captain Webber did not ask him to investigate the incident or give him instruction on handling it as Agent Barry was the team leader at that time (doc. 20-7, app. 1795–96).

On September 26, 1996, Judge Floyd reminded the jurors, "[I]f anything is said to you by anyone, . . . please report that to the agent immediately so we can deal with that on the spot." Judge Floyd understood "there was one little minor incident" where someone approached a juror at Bill & Fran's Restaurant and said "hung jury." In the future, he wanted "that information immediately so that we can deal with that" (doc. 21, app. 3490; doc. 22-4, supp. app. 3365–66). Judge Floyd also asked the jury on the record:

> And I would ask you, with regard to the incident, as to the statement made to one of the jurors by some passerby, does any member of the jury panel feel that that would cause them any problem in continuing as a juror and deciding this case fairly and impartially? And if so, if you will indicate by a raised hand? Nobody raises their hand, and I will place in the record at a later time what the SLED incident report was.

(*Id.*).

Juror Chris Conally testified at the PCR hearing that he heard the comment at the diner and that a gentleman was escorted out by SLED agents (doc. 20-6, app. 1615). Conally did not know specifically what the comment was, but he thought it was something about the petitioner (*id.*). Connally did not see the actual interaction between SLED agents and the man who made the comment (*id.* 1615–18; doc. 21, app. 3486–87). Juror Galbreath also recalled a man in the diner making a comment about a hung jury and being removed from the restaurant. Galbreath added that they were told that the man was taken to the courthouse to see the judge (doc. 20-6, app. 1550–51). Jurors McGuffin, Crocker, and West recalled hearing that a comment had been made in the diner one morning, but they did not hear the comment themselves nor did they witness anything in relation to the comment (*id.* 1608; doc. 20-7, app. 1825–26, 1833–34). Juror West vaguely recalled that another juror may have stated she heard the diner comment while the jurors were in the van on the way to court, but she could not specifically recall. (doc. 20-7, app. 1833). The jurors testified that nothing regarding this matter impacted their ability to remain fair and impartial throughout the petitioner's trial (doc. 20-6,  app. 1595–96, 1607; doc. 20-7, app. 1826–27, 1834–35; doc. 21, app. 3487). Juror Lamar also did not witness the incident but was aware

11

of it when it had happened. Someone told her that a man "hollered hung jury, hung jury . . . ." Juror Lamar explained that, when she stated at her deposition that the agents "practically hung him from the wall," she "was being facetious." She testified "that phrase hung from the wall, I'm quoting one of the SLED agents who did say something about, 'with things like this we have to practically hang them from the wall.'" Juror Lamar stated the agent was also being facetious (doc. 20-6, app. 1578). Juror Lamar's recollection is consistent with what SLED Agent Linda Marsh wrote in her report that she "told all of the jurors in the van that at any time a comment was made to anyone of them, to let us know immediately" (doc. 20-6, app. 1576–79; doc. 21, app. 3478, 3487).

Agent Marsh's report states that Edna Capps heard the comment in the restaurant but had "not told any of the SLED Agents about the comment" until she was in the van on the way to the courthouse. Agent Marsh testified that she had served on twenty to thirty sequestration teams during her thirty-seven years of employment with SLED. Based on her experience, she would report any issues to her supervisor. In the instant case, she vaguely recalled reporting the incident to her supervisor who in turn spoke to the judge (doc. 20-7, app. 1717–18, 1724–25; doc. 21, app. 3487–88).

Later in the day, outside the presence of the jurors, Judge Floyd revisited the incident. He stated, "The comment this morning was made at Bill and Fran's by somebody who walked by one of the jurors who is Ms. Edna Capps, I believe, who is the alternate" (doc. 22-4, supp. app. 3509). Based on the report of SLED Agent Linda Marsh, the trial judge understood that "none of the other jurors actually heard the remark. . . . Because she did not immediately report that, we were not able to apprehend that person to find out anymore" (*id*., supp. app. 3508–09). After a private attorney/client conference, trial counsel Harpootlian informed the court that the petitioner "would appreciate any tightening of access to the jury that could be had by SLED guard" (*id*., supp. app. 3509–10). Judge Floyd agreed, "I will instruct them to tighten up" (*id*., supp. app. 3510).

12

Juror John Grimes witnessed an incident where SLED removed an intoxicated hotel guest from one of the female juror's room.  He described a man who "had been drinking" and who "went up the stairs and one of the ladies up there had her door open, he walked in her room, asked her if she wanted a drink." When "another lady came out and yelled to the agents," SLED "ran up there" and "physically removed" the man (doc. 20-6, app. 1516–17, 1527–30).  Juror Lamar knew about this incident.  She recalled, "[A] man came into one of the jurors' rooms and that he was apparently intoxicated and that the juror . . . went outside and called one of the SLED agents . . . and he was hustled out of there" (*id*. 1579–80).  SLED did not inform Judge Floyd about this incident.  Judge Floyd testified as follows:

> Q.  Okay.  Were you made aware of an incident where a hotel guest entered a female juror's room?
>
> A.  No.
>
> Q.  Okay, Is that something you would want to know about?
>
> A.  It depends whether it was intentional or incidental. . . . . If it was an intentional attempt to contact a juror, then, yeah, I would want to know that.  If it was just incidental, no.
>
> Q.  Okay.  And, again, if that would have been brought to your attention, would you have dealt with it on the record somehow like you did with the hung jury incident?
>
> A.  Again, that depends on whether it would affect the jury' ability to serve and make a decision.  I mean, things happen, even in sequestration situations, that don't rise to the level of – if the trial judge needs to always put everything on the record. But first of all, you've got to know about it.

(Doc. 20-12, app. 2503–04; doc. 21, app. 3494–96).  The PCR court found that this contact was incidental, unrelated to the trial, and that it did not constitute an assault (doc. 21, app. 3496–99).

Judge Floyd testified that if a juror indicated he or she wanted the judge notified or if either juror indicated the matter would affect their ability to serve on the jury, he

13

believed he should have been notified (doc. 20-11, app. 2497–98). He expected the SLED agent to make the initial inquiry regarding the impact a matter has on a juror (doc. 20-12, app. 2504). He testified further that he believed the forelady was very smart and had "lots of common sense" and that she would have told him if she thought something was important (doc. 20-11, app. 2497–98). Further, if juror Galbreath, or juror Lamar, or anyone else believed this matter was important or "if something was really wrong," any one of them could have and would have reported it to him (*id*. 2496–98).

### SLED Sequestration Manual

On January 10, 2011, and subsequent to the evidentiary hearing but before the PCR court's ruling on the petitioner's PCR application, the petitioner moved to reopen the record in this case and for the court to order SLED to produce a 1996 Jury Sequestration Manual (doc. 20-14, app. 3114–17). The petitioner attached a 2000 Jury Sequestration Manual that counsel had in his possession since 2007 to the motion as the basis for the request (*id.*. 3118–48). He argued that SLED published a first edition of a jury sequestration manual several months before his trial, and the manual was not provided to him in discovery. On February 11, 2011, the respondent opposed the motion contending the petitioner failed to make a proper showing to reopen the record because the petitioner's counsel had knowledge and possession of the 2000 Jury Sequestration Manual since 2007 (doc. 20-15, app. 3160–66). The respondent also opposed the motion because the 2000 Jury Sequestration Manual would not make a difference in the outcome of the case as it was expressly intended as instructional information and guide, was not mandatory, and made clear that the presiding judge would exercise his discretion to provide the instructions with regard to jury sequestration, which may or may not comport with the manual (*id.*, app. 3160–61). The respondent on February 23, 2011, also filed a supplemental return (*id*. 3167–68). On March 22, 2011, the PCR court denied the petitioner's motion to reopen, noting that discovery had been ongoing for eleven years in this case and that "[d]iscovery and litigation in this case must end (*id*. 3198–99). On April 11, 2011, the petitioner moved the PCR court to reconsider its ruling, and it was denied on May 20, 2011 (*id*. 3331). On

14

July 22, 2011, the petitioner filed a second motion to reopen, along with a proffer of the 1996 SLED Jury Sequestration Manual that he obtained from SLED via a Freedom of Information Act request; the petitioner also moved to recuse the Attorney General's Office (*id*. 3333–39). A hearing on the motion was held, and the motion was denied.   In an order dated September 7, 2011, and filed on September 8, 2011, the PCR court stated that the manual was a guide only, and the procedure for jury sequestration was up to the presiding judge (doc. 21, app. 3512–15).   On September 19, 2011, as part of post-trial motions, the petitioner moved the court to reconsider its order denying his second request to reopen the record and moved for a new trial (*id*. 3516–30).   In an order dated November 15, 2011, and filed on November 21, 2011, the PCR court denied the petitioner's post-trial motions (*id*. 3556–57).

***Direct Appeal***

On September 14, 1998, the petitioner filed an appeal.   The petitioner was represented by John Delgado of the Richland County Bar.   In the final brief of appellant, the petitioner raised the following issues:

> I. Did the trial judge err in refusing to grant Appellant's motion for a mistrial made in response to testimony that Appellant's wife had consulted Sister Care?
>
> II. Did the trial judge err in admitting photographs of Appellant which revealed scratches on his wrist and neck?
>
> III. Did the trial judge err in admitting evidence of a life insurance policy on Victoria Beckham?
>
> IV. Did the trial judge err in admitting evidence of tax liens filed against the Beckhams in the amount of $27,539 and $37,864?
>
> V. Did the trial judge err in allowing the State to present the testimony of a witness attacking Appellant's alibi despite the fact that the State had given no notice?
>
> VI. Did the trial judge err in chastising a defense witness in the presence of the jury?

15

VII. Did the trial judge err in allowing the State to present testimony about and a picture of an extinguished fire to the jury?

VIII. Did the trial judge err in allowing the State to present evidence of flight?

IX. Did the trial judge err in refusing to quash the search warrant issued on July 11, 1995, and in refusing to exclude gloves seized pursuant to that warrant?

X. Did the trial judge err and deny Appellant a fair trial and due process of law by improperly excluding crucial defense evidence?

> A. Did the trial judge err in excluding evidence that Special Agent "Spike" McCraw had stated in an affidavit that the police were looking for two white males?

> B. Did the trial judge err in excluding evidence of a composite drawing that was drawn of the second man seen on Little Mountain Road on June 12, 1994?

> C. Did the trial judge err in excluding evidence of the conduct of the authorities during the questioning of Jamie Suber?

> D. Did the trial judge err in excluding evidence of phone calls from Rick Mitchell to the Myrtle Beach area?

(Doc. 18-1).  The respondent, through Assistant Attorney General Robert E. Bogan, made a final brief of respondent on September 14, 1998 (doc. 18-2).  A final reply brief by appellate counsel Delgado was made on September 14, 1998.  The Supreme Court of South Carolina affirmed the petitioner's convictions and sentences on February 22, 1999. *State v. Beckham*, 513 S.E.2d 606 (S.C. 1999).  The Remittitur was issued on March 18, 1999.  Certiorari was not sought to the United States Supreme Court.

***PCR***

The petitioner filed an application for post-conviction relief ("PCR") on February 15, 2000, a first amended application on August 1, 2002, a second amended

16

application on June 2, 2010, and a third amended application on August 30, 2010. The State made its return on April 20, 2000 and an amended return to the third amended application on September 15, 2010. The PCR court denied a motion for summary judgment after hearing argument prior to convening the evidentiary hearing. An evidentiary hearing into the matter was convened on September 28–30, 2010, at the Newberry County Courthouse before the Honorable Brooks P. Goldsmith, South Carolina Circuit Judge. The petitioner was present at the hearing and was represented by Diana Holt, Charles Grose, and Tara Shultz. Assistant Attorney General Jennifer Kinzeler and Senior Deputy Assistant Attorney General Salley Elliott appeared for the respondent. The petitioner presented testimony from the following jurors: John Grimes, Jack Galbreath, Alice Lamar, Kathy McGuffin, Christopher Connally, and James Cooprider; the following sequestration team members: Kenneth Mears, Linda Marsh, Charles Rudloff, and Robert Jenkins; in addition to testimony from Margaret Knox, employed with SLED. The petitioner also subsequently obtained testimony from Judge Floyd (trial court judge), W. Townes Jones, IV (lead prosecutor), and Jack B. Swerling (one of the petitioner's defense attorneys at trial) through post-hearing depositions in lieu of live testimony, the last of which concluded on November 11, 2010. The respondent presented testimony from the following jurors: Brandy Reid Crocker, Marjorie West, and Della Price; the following sequestration team members: Stacey Snow, James Barry, Ann Reese, Carl Alston, David Roper, George Oliver, Irene Dukes, and Gary Martin; the following additional former or current SLED agents or employees: Lamar Wiggins, Harold Gregory, Lieutenant Ben Moore, Natalie Talbert, Cindy Dudney, and Reginald I. Lloyd, and the three additional prosecutors responsible for prosecuting this case (Michael T. Coulter, Betty C. Strom, and the Honorable R. Knox McMahon).

Subsequent to the hearing, the parties conducted depositions *de bene esse* of Judge Floyd, Townes Jones, and Jack Swerling. The petitioner made two motions to reopen the record and a motion to reconsider to which the respondent made return. The PCR court denied the motions. A hearing was held on the second motion.

17

After receiving post-hearing briefs and memoranda from the parties, the PCR judge issued an order dated September 7, 2011, vacating the petitioner's sentence for kidnaping and denying relief on all other grounds (doc. 21, app. 3384-3510). The petitioner filed a post-trial motion on September 19, 2011, asking the circuit court to reconsider its order denying his second motion to reopen the record, moving for a new trial, and moving to alter or amend the judgment pursuant to Rule 59(e), SCRCP. The respondent made a return. The petitioner submitted a reply to the return on October 6, 2011, and Judge Goldsmith denied the petitioner's post-trial motions to reconsider, for a new trial, and to alter or amend on November 21, 2011.

### PCR Appeal

The petitioner appealed denial of PCR on December 5, 2011. A petition for writ of certiorari was submitted by the petitioner on January 10, 2013. In the petition, the petitioner was represented by Diana Holt and E. Charles Grose, Jr., of the South Carolina Bar. In the petition, the petitioner raised the following issues:

> I. Did the PCR Court err by not applying the "implied bias" doctrine? Beckham presented evidence of repeated and substantial external contacts and invasions of privacy of the sequestered jurors who sat in judgment during his capital murder trial (PCR Grounds A through G)?
>
> II. Did the PCR Court err by not applying the *Remmer* presumption of prejudice? Beckham presented evidence of repeated and substantial external contacts and invasions of privacy of the sequestered jurors who sat in judgment during his capital murder trial (PCR Grounds A through G)?
>
> III Did the PCR Court err by not concluding that Beckham established prejudice? Beckham presented evidence of repeated and substantial external contacts and invasions of privacy of the sequestered jurors who sat in judgment during his capital murder trial (PCR Grounds A through G)?
>
> IV. Did the PCR Court err by allowing the State to question the jurors concerning their verdict, in violation of Rule 606(b), SCRE, about whether the external contacts and invasions of privacy affected their deliberations?

18

V. Did the PCR Court err by denying Beckham's motion for summary judgment when the undisputed evidence showed that juror John Grimes failed to properly disclose that, while he sat on Beckham's capital murder trial, he was licensed by SLED as an armed security guard with the power to arrest, and, therefore, disqualified as a juror pursuant to S. C. Code Ann. § 14-7-820 (PCR Grounds I)?

VI. After a full hearing on the merits, did the PCR Court err by denying Beckham's motion for summary judgment when the undisputed evidence showed that juror John Grimes failed to disclose that, while he sat on Beckham's capital murder trial, he was licensed by SLED as an armed security guard and, therefore, disqualified as a juror pursuant to S.C. Code Ann. §14-7-820 (PCR Grounds I)?

VII. Did the PCR Court err by not granting Beckham a new PCR hearing or even by simply reopening the record of the pending PCR so that Beckham could conduct additional discovery and present evidence about the SLED Jury Sequestration Manual, when the State possessed the manual during Beckham's PCR hearing and willfully failed to disclose it during pre-trial discovery or during the hearing and post-hearing de bene esse depositions, in violation of the Rules of Civil Procedure?

VIII. Did the PCR Court err by not applying a cumulative error analysis?

(Doc. 18-6).

The respondent, through Assistant Deputy Attorney General Salley W. Elliott, made a return to the petition for writ of certiorari on June 27, 2013. The South Carolina Supreme Court entered its order denying the petition for writ of certiorari on August 7, 2014. *Stephen Beckham v. State of South Carolina*, Appellate Case No. 2011-204368 (doc. 18-9). The petitioner filed a petition for rehearing on August 19, 2014. The petition was denied on October 8, 2014. The Remittitur was issued on October 8, 2014 (doc. 18-12).

## **FEDERAL PETITION**

On November 11, 2014, the petitioner filed his Section 2254 petition (doc. 1). On March 26, 2015, the respondent filed a motion for summary judgment (doc. 19). On May 14, 2015, the petitioner filed his response in opposition (doc. 29).

19

In his federal habeas petition, the petitioner makes the following claims:

I.    During Stephen Beckham's state post-conviction relief proceedings, Beckham presented extensive and well-documented evidence of repeated and substantial external contacts and invasions of privacy of the sequestered jurors who sat in judgment during his capital murder trial. The PCR judge issued an order of dismissal on September 7, 2011 finding that Beckham failed to meet his burden of proving prejudice. Beckham's right to a fair and impartial jury, guaranteed by the Sixth and Fourteenth Amendments was violated by these improper contacts, and he was substantially prejudiced by them.

Footnote. 1 The South Carolina Law Enforcement (SLED) agents who were in charge of the jurors failed to inform presiding Judge Henry Floyd of these invasions and, in fact, no one knew of them until PCR counsel obtained access to the SLED files. Then, despite over 10 years of litigation in state court, during which SLED repeatedly claimed there was "no written protocol" for its sequestration teams, Judge Floyd sent what turned out to be a SLED Juror Sequestration Manual to the Attorney General's Office where it remained in the AG's possession until after the record in this matter was closed. The AG then fought to keep the record closed.

II. At Beckham's trial, counsel labored to give the jury a full picture of the State's investigation of Victoria Beckham's murder that quickly, and narrowly, focused on him at its very earliest stages. The trial court judge, however, consistently ruled against the admission of relevant and probative evidence, eviscerating Beckham's defense and leaving the jury with a distorted view of the investigation. The judge's failure to allow Beckham to present a defense strengthened, in the eyes of the jury, the testimony of the State's key witness—Richard Anderson's—that was confused, self-serving, and incredible. Beckham's right to present a defense, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by the improper exclusion of evidence from his trial.

> A. The trial judge erred in excluding evidence that Special Agent "Spike" McCraw had stated in an affidavit that the police were looking for two white males.

> B. The trial judge erred in excluding evidence of a composite drawing that was drawn of the second man seen on Little Mountain Road on June 12, 1994.

> C. The trial judge denied Beckham his right to present a defense when he excluded evidence of the conduct of the authorities during the questioning of Stephen Beckham's nephew, Jamie Suber.

20

> D. The trial judge denied Beckham his right to present a defense when he excluded evidence of phone calls from Rick Mitchell to the Myrtle Beach area.

(Doc. 1 at 5-30).

## APPLICABLE LAW

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts

21

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson,* 477 U.S. at 248.  Summary judgment is not "a disfavored procedural shortcut" but an important mechanism for weeding out "claims and defenses [that] have no factual bases."  *Celotex*, 477 U.S. at 327.

***Habeas Corpus Standard of Review***

Because the petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997). Under the AEDPA, federal courts may not grant habeas corpus relief on any claim that was adjudicated on the merits in state court unless the underlying state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable application of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1), (2). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Moreover, state court factual determinations are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

***Exhaustion and Timeliness***

The respondent acknowledges that the two grounds raised in the Section 2254 petition are exhausted (doc. 18 at 23, 77) and that the Section 2254 petition was timely filed (*id*. at 22).

## ANALYSIS

### Ground One

In the petitioner's first ground, he makes a series of allegations concerning alleged improper contact with jurors during the trial. Specifically, he alleges that he was denied a fair trial because of third party contact concerning the motel rooms of jurors Galbreath, Capps, and one unidentified juror. He also claims he was prejudiced by a comment made by a patron at a diner where jurors were eating, as well as the failure of the SLED sequestration team to notify the judge, the prosecutors, or defense counsel about these matters. The petitioner further argues that nondisclosure of a SLED jury sequestration manual by the Attorney General's office also deprived him of a fair trial (petition 5–6).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to trial by an impartial jury. *See* U.S. Const. amend VI. An impartial jury is one that arrives at its verdict "based on the evidence developed at trial" and without external influences. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "No right touches more the heart of fairness in a trial," *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988), "and this right applies equally to sentencing proceedings that are tried to a jury." *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014).

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Rather, a court must determine whether the contact had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637. In this context, *Remmer*'s[9]

_____

[9]In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court considered
(continued...)

23

presumption of prejudice does not apply. *Barnes*, 751 F.3d at 252–53.  Rather, to succeed on his claim, the petitioner must "affirmatively prove actual prejudice by demonstrating that the jury's verdict was tainted by the extraneous communication." *Id.* at 253.

In other words, "not every allegation of an unauthorized communication between a juror and a third party will trigger the *Remmer* presumption and its corresponding hearing requirement." *Barnes*, 751 F.3d at 244.  Rather, "the *Remmer* presumption and hearing requirement are triggered after the party attacking the verdict satisfies the 'minimal standard' of showing that 'extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.'" *Id.* at 245 (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996)).  In determining the nature of the third-party contact, courts refer back to the factors recited in *Remmer*:  any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury. *See Cheek*, 94 F.3d at 141 (citing *Remmer*, 347 U.S. at 229).

Should the habeas court find itself "in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail." *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002).  "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipose' regarding the error's harmlessness." *Id.*

---

[9](...continued)
an alleged bribery attempt of a juror during trial, and the FBI's investigation of the attempt, all of which was handled by the district court in an *ex parte* proceeding prior to the verdict being delivered. After learning of the incident through post-trial press accounts, the defendant moved for a new trial and requested "a hearing to determine the circumstances surrounding the incident and its effect on the jury." *Id.* at 228. The Supreme Court held:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id*. at 229.

In cases where a state court considered and denied a claim on its merits, a federal habeas court may grant habeas relief only if the state court decision was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) and (d)(2).    While a state court's factual determinations are entitled to deference, deference, however, "does not imply abandonment or abdication of judicial review" and "does not by definition preclude relief." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's decision involves an unreasonable application of federal law when the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a particular] case," or "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006). "The state court's application of clearly established federal law must be 'objectively unreasonable,' for a 'federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly.'" *Jackson v. Johnson*, 523 F.3d 273, 277 (4th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. at 409).

With respect to subsection 2254(d)(2), the Supreme Court has observed that although the term "unreasonable" is difficult to define, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Moreover, under section 2254(e)(1), a determination of a factual issue by a State court "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 342 (2006).

In *Wood v. Allen*, the Supreme Court granted certiorari to resolve the question of "whether, in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." 558 U.S. at 299–300.  The Supreme Court did not reach the issue of "whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2). *See Wood*, 588 U.S. at 300 ("Although we granted certiorari to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together, we find once more that we need not reach this question, because our view of the reasonableness of the state court's factual determination in this case does not turn on any interpretive difference regarding the relationship between these provisions. ").

### Motel Room Incidents

As set forth above, the PCR court received testimony from juror Galbreath that upon his return to the motel after the first day of trial, September 19, 1996, he noticed that his suitcase had been "gone into" because the locks were completely closed.  His clothes, which are normally folded, were "just scattered all through the suitcase" but nothing was

missing and there were no broken windows, jammed door frames, or any indication of forced entry (doc. 20-7, app. 1544, 1561). Juror Galbreath brought this to the attention of SLED Agent Barry. Although the testimony at the PCR hearing differs as to the exact sequence of events, this incident resulted in an investigation by SLED Agent Talbert. In light of Judge Floyd's *de bene esse* deposition, it appears that this matter was not reported to Judge Floyd during the trial. A similar incident happened approximately one week later. Juror Galbreath did not report this to SLED, but to the jury foreperson (doc. 20-7, app. 1548–49).

A similar incident involving juror Capps[10] took place on September 22, 1996, but was not reported until the next morning. She reported that some of her undergarments were missing from her hotel room (doc. 20-9, app. 2236 [incident report]; doc. 21, app. 3480–81). The matter involving juror Capps was investigated by SLED Agent Rudloff (doc. 20-7, app. 1734). This incident was not reported to Judge Floyd during the trial (doc. 20-11, app. 2498).

The PCR court noted that the evidence supported the conclusion that there was no break-in or intrusion into juror Galbreath's room and that the hotel maid locked juror Galbreath's suitcase before moving it for cleaning (vacuuming) or changing the linens (doc. 21, app. 3477). The PCR court found that "[t]he record is void of evidence of prejudice arising from the incidents respecting Juror Galbreath and any juror's ability to serve fairly and impartially" (*id.*). With regard to Agent Talbert's investigation of the matter, the PCR court found that the evidence did not show that Agent Talbert's presence or inquiry had any impact on juror Galbreath or any other juror's ability to serve fairly and impartially on the jury (*id.* 3478). As to juror Capps, the PCR court found that the missing items were not related to the petitioner's trial and did not have any prejudicial impact on juror Capps or the other members of the jury (*id.* 3483–85).

---

[10]Edna Capps was an alternate juror during the guilt phase of the trial, but was seated on the jury during the sentencing phase after another juror was excused because of illness.

Although juror Capps could not be located at the time of the PCR hearing, juror Galbreath testified that the two incidents involving his suitcase and his knowledge of the missing items of juror Capps did not affect his ability to remain fair and impartial (doc. 20-6, app. 1534).  Juror McGuffin also testified that, although she was aware about another juror's missing clothing, nothing she heard prevented her from being fair and impartial (*id*. 1562).  Six jurors were not aware of the matter pertaining to juror Capps (*id*. 1594, 1618; doc. 20-7, app.1827, 1835; doc. 20-8, app. 1940, 2103).  The PCR received testimony from some of the former jurors and agents on the SLED sequestration team.  Deference is to be accorded to a PCR court's evaluation of the credibility of witnesses. *Elmore v. Ozmint*, 661 F.3d 783, 850 (4th Cir. 2011) ("We must be 'especially' deferential to the state PCR court's findings on witness credibility, and we will not overturn the court's credibility judgments unless its error is 'stark and clear.'").  The PCR court found that the incidents related to juror Galbreath and juror Capps were not related to the petitioner's trial.

Based upon the foregoing, there has been no showing that the motel room incidents had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. 637–38.  As the petitioner has failed to show that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, habeas relief is not warranted on this issue.

### Incident at Bill & Fran's Restaurant

As earlier stated, while the jurors were at Bill & Fran's Restaurant, a patron blurted out the phrase "hung jury" in the presence of some of the jurors.  It appears that SLED agents escorted the person out of the restaurant, but did not arrest him.  Juror Capps, who was then an alternate juror, reported the incident to the sequestration team.  At trial, Judge Floyd addressed the matter and asked the jurors if the incident would cause them any

problems in continuing to be fair and impartial (doc. 21, app. 3365–66, 3508–10, 2523–24). No juror indicated that he or she could not be impartial or fair.  The trial transcript indicates that Judge Floyd noted that the incident involved a smart remark.  The PCR court found that the petitioner had failed to prove any resulting prejudice respecting this allegation (doc. 21, app. 3427).  The PCR court noted that jurors Capps and Connally were the only jurors who might have heard the "hung jury" comment, while a few others had some recollection of the comment being made.  However, every one of them confirmed on the trial record that nothing about the matter had any bearing on their ability to remain fair and impartial (*id.* 3429).

There has been no showing that the diner incident had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. 637–38. Again, as the petitioner has failed to show that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings, habeas relief is not warranted on this issue.

### Drunken Hotel Guest

The PCR court also addressed the incident where an intoxicated hotel guest entered an open doorway of a juror and offered the juror a drink from an open bottle of an alcoholic beverage.  The PCR court concluded that this contact was an attempt by the person to be friendly and social, was not related to the pending case, did not constitute an assault, did not result in any discussion of the pending case, and did not convey prejudicial information (doc. 21, app. 3494–99).  The PCR court rejected the petitioner's claims that the matter was presumptively prejudicial (*id.*).  In any event, testimony before the PCR court indicates that SLED agents promptly got the person out of the juror's room and took him back to his room where his wife was located (doc. 20-6, app. 1516–17).  There has been no showing that the drunken hotel guest incident had a "substantial and injurious effect or

influence in determining the jury's verdict." *Brecht*, 507 U.S. 637–38.  As the petitioner has failed to show that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings, habeas relief is not warranted on this issue.

### Foreperson's Inquiry after the Galbreath Suitcase Incident

After juror Galbreath told the jury foreperson about the first incident relating to his suitcase, the jury foreperson (juror Lamar) inquired of other jurors if they had experienced any problems with their luggage, but did not discuss the facts of the pending criminal case (doc. 20-6, app. 1572–73, 1593).    The PCR court determined that the foreperson's inquiry to other jurors had nothing to do with the trial, any juror's ability to serve, or with the matter pending before the jury (doc. 21, app. 3399-3502).  This finding by the PCR court is also entitled to deference.  As is correctly noted by the respondent, "the jurors were not prohibited from talking to one another; rather, they were prohibited from discussing the matter pending before them prematurely and from watching, reading, or listening to anything about the matter pending before them" (doc. 18 at 64).   There has been no showing that the jury foreperson's inquiry had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. 637-38.  As the petitioner has failed to show that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings, habeas relief is not warranted on this issue.

### Sequestration Manual

Matters pertaining to a 1996 Jury Sequestration Manual were addressed by the PCR court after the holding of the evidentiary hearing but before the PCR court issued its ruling on the merits.  On January 10, 2011, petitioner's PCR counsel moved to reopen

the record in the PCR case and for the court to order SLED to produce a 1996 Jury Sequestration Manual.  The petitioner's motion was premised on the existence of a 2000 Jury Sequestration Manual.  The 2000 Jury Sequestration Manual, according to petitioner's PCR counsel, was based on an earlier first edition issued several years prior to the petitioner's trial.  Counsel for the State opposed the motion.  The PCR court denied the motion on September 7, 2011 (doc. 21, app. 3512–15).  The PCR court stated, "The documents proffered are guides only and are not binding upon the presiding judge.  The specific instructions, process and procedure for the jury sequestration was within the discretion, control and authority of the presiding judge.  Applicant fails to show prejudice" (*id.* 3513).  The petitioner's PCR counsel filed subsequent motions on this issue, which were denied by the PCR court (*id.* 3556-57).

The respondent contends that this issue is foreclosed from federal habeas review under case law holding that deficiencies in post-conviction proceedings are not cognizable under Section 2254 (doc. 18 at 66). The undersigned agrees. *See Pennsylvania v. Finley*, 481 U.S. 551, 557–59 (1987); *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) (collecting cases holding that errors in a state post-conviction proceeding "cannot serve as a basis for federal habeas corpus relief"); and 28 U.S.C. § 2254(i).  In light of the fact that a state collateral proceeding, such as post-conviction case, is an original proceeding, the admission or non-admission of the 1996 Jury Sequestration Manual is ultimately an evidentiary ruling.

Federal habeas relief is restricted to claims alleging an improper application of federal law. 28 U.S.C. § 2254(d)(1) (application shall not be granted unless the claim was based on an improper application of federal law); *see also Wilson v. Corcoran*, 561 U.S. 1, 5 (2010) ("But it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.  The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner only on

31

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (internal quotations and citations omitted) (emphasis in original). Evidentiary rulings are generally considered state law matters. *Spencer v. Murray*, 5 F.3d 758, 763 (4th Cir. 1993) ("[A] claim about the admissibility of evidence under state law rarely is a claim upon which federal habeas corpus relief can be granted."). Evidentiary rulings will not be considered in federal habeas "'unless [the] erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000)).

Finally, a federal district court, when considering federal habeas corpus claims involving state evidentiary rulings, does "not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Burket*, 208 F.3d at 186, which is cited in *Porterfield v. Warden, Lieber Correctional Inst.*, Civil Action No. 0:14-927-TMC, 2015 WL 1301479, at *4 (D.S.C. Mar. 23, 2015). Hence, the denial of admission of the 1996 SLED Sequestration Manual in the PCR case is not a basis for federal habeas corpus relief with respect to the underlying criminal case. *See Wright v. Angelone*, 151 F.3d 151, 156–58 (4th Cir. 1998); *Chance v. Garrison*, 537 F.2d 1212, 1215 (4th Cir. 1976); and *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960), which hold that state law issues are not valid grounds for federal habeas corpus relief.

Based upon the foregoing, summary judgment should be granted to the respondent as to the petitioner's claims presented in Ground One.

### Ground Two

In Ground Two, the petitioner submits four claims regarding the trial court's exclusion of evidence. Specifically, he claims the trial court erred in excluding from evidence Agent McCraw's affidavit and a composite drawing. The petitioner further argues that the trial court denied the petitioner his right to present a defense when it excluded evidence of

32

police conduct through the testimony of Jamie Suber and by excluding phone call evidence from Rick Mitchell (doc. 1 at 24–30).  According to counsel for the petitioner, these exclusions of evidence denied the petitioner his right to present a defense.

The first two of the four evidentiary contentions raised by the petitioner ultimately concern a now-superannuated doctrine of South Carolina evidentiary law prohibiting the introduction of third-party guilt by the accused in a criminal trial. *See*, *e.g.*, *State v. Gay*, 541 S.E.2d 541, 544–45 (S.C. 2001); and *State v. Gregory*, 16 S.E.2d 532, 534–35 (S.C. 1941).

### Agent McCraw's Affidavit

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court of the United States, in a unanimous decision, held that this rule of South Carolina evidence prohibiting a defendant from introducing evidence of third-party guilt if the prosecution had introduced forensic evidence which, if believed, would strongly support a guilty verdict violated a criminal defendant's federal constitutional right to have a meaningful opportunity to present a complete defense because the strength of a prosecutor's case was not necessarily related to whether a defendant's evidence of third-party guilt was too weak for admissibility. 547 U.S. at 321, 329–31.

The petitioner's trial took place from September 19, 1996, through October 1, 1996.  The United States Supreme Court's decision in *Holmes* was issued on May 1, 2006, which was more than nine and one-half years after the petitioner's trial and more than seven years after the Supreme Court of South Carolina decided the petitioner's direct appeal.

*Holmes v. South Carolina* provides no basis for granting habeas relief to the petitioner.  First, the Supreme Court of South Carolina agreed with the petitioner's appellate counsel that the trial judge erred in not admitting impeachment evidence pertaining to SLED Agent "Spike" McCraw.  The Supreme Court of South Carolina, however, found that the error was harmless because McCraw's testimony was cumulative to the testimony of

33

Richard Anderson, who implicated the petitioner. *State v. Beckham*, 513 S.E.2d at 609, 614. Moreover, as noted by the respondent, this type of claim is subject to a harmless error anaylsis. *See Neder v. United States*, 527 U.S. 1, 18 (1999). Here, the Supreme Court of South Carolina reasonably determined that an error in the exclusion of the affidavit was harmless as the State's case relied primarily on the testimony of Richard Anderson and many of the facts testified to by Agent McCraw were corroborated by other witnesses or by neutral business records. *See Beckham*, 513 S.E.2d at 614-15.

Although the trial judge's exclusion of evidence pertaining to third-party guilt would not pass muster under *Holmes* and current law interpreting *Holmes*, *Holmes* was not controlling law at the time of the petitioner's trial in 1996 and direct appeal in 1999. To obtain relief under *Holmes*, the Supreme Court of the United States would have to have held that *Holmes* applied retroactively. *See Tyler v. Cain*, 533 U.S. 656, 663 (2001) (only the Supreme Court of the United States can make a decision or rule retroactive to cases on collateral review: "We thus conclude that a new rule is not 'made retroactive to cases on collateral review' unless the Supreme Court holds it to be retroactive."). The holding in *Holmes* is not retroactive because the Supreme Court of the United States has not expressly held it to be retroactive. *See*, *e.g.*, *Sanders v. United States*, 247 F.3d 139, 151 (4th Cir. 2001).

The petitioner is not entitled to habeas relief under *Holmes* based on the holding in *Teague v. Lane*, 489 U.S. 288 (1989), which sets forth a three-part analysis to determine when new procedural rules should apply retroactively on collateral review. The first step is to determine whether a defendant's conviction was finalized as of the date the "new rule" was announced. *Teague*, 489 U.S. at 310; *Sanders*, 247 F.3d at 146. The second step is to determine whether the Supreme Court's particular ruling did in fact create a "new rule" of constitutional criminal procedure. *Teague*, 489 U.S. at 310; *Sanders*, 247 F.3d at 146. The third step requires a determination of whether that new rule falls into one

34

of two very narrow exceptions providing for retroactivity. *Teague*, 489 U.S. at 310-11; *Sanders*, 247 F.3d at 146-47.

       The petitioner does not meet the first part of the *Teague* test because his conviction became final in 1999, approximately seven years before *Holmes* was decided. The petitioner satisfies the second part of *Teague* test because *Holmes* overruled a longstanding rule of South Carolina evidentiary law.  Nonetheless, the petitioner fails to satisfy the third prong of the *Teague* test.  A defendant may satisfy the third prong of the *Teague* test by showing:  (1)  that the new rule places certain types of private conduct beyond the power of the criminal law-making authority to proscribe; or (2) the possibility that a person convicted by means of an invalidated procedure might have been acquitted otherwise.  The petitioner cannot satisfy the first alternative of the third prong because it  is axiomatic that South Carolina may prohibit the murder of one's spouse. *See State v. Tindall*, 44 S.C.L. (10 Rich.) 212, 212 (1856).  The petitioner does not satisfy the second alternative of the third prong of the *Teague* test because, in light of the evidence presented at the petitioner's trial, it does not diminish the accuracy of the conviction. *See Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (noting that a new procedural rule justifying retroactivity "ha[s] yet to emerge").  Hence, the exclusion of impeachment testimony relating to Agent McCraw is not a basis for federal habeas corpus relief.

### Composite Drawing

       At trial, counsel for the petitioner sought to introduce a composite of a second man seen by witnesses on Little Mountain Road on June 12, 1994.  At the time, the petitioner could not have been at that location.  At trial, trial counsel contended that the composite was not being introduced for the truth of the matter asserted, but that the composite was critical to show that there were two men on the road and that authorities were searching for two men.  Trial counsel indicated that the composite would attack the credibility of Agent McCraw and Richard Anderson, who had testified that there was no one

35

except the petitioner involved in the crime.  The prosecutor objected to the introduction of the composite on the grounds that, even if it were a present sense impression, it was inadmissible because it raised the conjecture of third party guilt.  Judge Floyd excluded the evidence because it was offered as evidence of third party guilt (doc. 22-2, supp. app. 2960). The Supreme Court of South Carolina denied relief on this claim finding that the exclusion of this impeachment evidence was harmless as it was cumulative to the testimony of Robert Bowers, who testified that he and Johnnie Hawkins drove by Little Mountain Road on the night of June 12th. Bowers testified that Hawkins had told him he saw two persons by the side of Little Mountain Road on June 12th. *Beckham*, 513 S.E.2d at 615.

As with the exclusion of impeachment testimony related to Agent McCraw, even if the exclusion of the composite drawing would now violate the holding in *Holmes v. South Carolina*, the holding in *Holmes* is not retroactive to the petitioner's criminal case.

### Evidence Relating to Questioning of Jamie Suber

At trial, counsel for the petitioner proffered, *in camera*, the testimony of Jamie Suber, the petitioner's cousin, to attack the investigation by law enforcement by showing bias, prejudice, and state of mind.  The petitioner contends that the exclusion of this evidence denied his right to present a defense.  Judge Floyd ruled that the testimony was not admissible because it was not relevant, was not proper character evidence under South Carolina law, and did not fall within the scope with South Carolina Rule of Evidence 803(3) (doc. 22-7, supp. app. 4185–86).

This issue was raised on direct appeal as issue X(C).  The Supreme Court of South Carolina upheld the exclusion of this evidence as irrelevant.  Unlike the two previously discussed evidentiary rulings, this issue does not pertain to third party guilt, so the holding in *Holmes v. South Carolina* is not applicable.  The Supreme Court of South Carolina found no error in the exclusion of the proffered testimony of Jamie Suber because the police

36

tactics were not relevant "as this evidence did not make anything of consequence to the action more or less probable." *Beckham*, 513 S.E.2d at 615.

Both the trial court and the Supreme Court of South Carolina held that the proffered testimony was not admissible under the South Carolina Rules of Evidence. The exclusion of the proffered testimony is not a basis for federal habeas corpus relief because it is an issue of state evidentiary law and does not implicate any federal constitutional claims. *See Wright*, 151 F.3d at156–58; *Chance*, 537 F.2d at 1215; and *Grundler*, 283 F.2d at 802 ("Normally, the admissibility of evidence, the sufficiency of evidence, and instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues."), which hold that state law issues are not valid grounds for federal habeas corpus relief. The petitioner cannot obtain federal habeas corpus relief on a state law ground. *See Wright*, 151 F.3d at 156–58; *cf. Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Essentially, with respect to the exclusion of the proffered testimony of Jamie Suber, there is no alleged violation of *federal* law to review. *See* 28 U.S.C. § 2254(d)(1) (application shall not be granted unless the claim was based on an improper application of federal law). There has been no showing that the evidentiary ruling, even if erroneous, was " 'so extreme as to result in a denial of a constitutionally fair proceeding.' " *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir.2008) (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir.2000)). Accordingly, the petitioner is not entitled to federal habeas relief on this ground.

### Phone Calls from Rick Mitchell to the Myrtle Beach Area

The petitioner contends that the trial court's exclusion of ten then-recent phone calls from Rick Mitchell's residence in Anderson, South Carolina, to the Myrtle Beach area denied his right to present a defense. These ten calls took place two years after the murder. Trial counsel sought to introduce these phone calls to impeach or refute Rick Mitchell's trial

37

testimony that he had not had any contact with his "old gang" for over a year prior to trial. According to the petitioner's trial counsel, these calls were relevant on issue of Mitchell's credibility. The trial court excluded the evidence (doc. 22-9, pp. app. 4725–26). This issue was raised on direct appeal and was rejected by the Supreme Court of South Carolina, which found as follows: "When a witness denies an act involving a matter collateral to the case in chief, the inquiring party is not permitted to introduce contradictory evidence to impeach the witness. *State v. Dubose*, 288 S.C. 226, 341 S.E.2d 785 (1986)." *Beckham*, 513 S.E.2d at 615. The exclusion of impeachment testimony on matters collateral to the case in chief has been the rule in South Carolina for at least 116 years. *See State v. Brock*, 126 S.E. 28, 28–29 (S.C. 1925); and *State v. Summer*, 32 S.E. 771, 773–74 (S.C. 1899).

      The exclusion of these telephone calls does not concern third-party guilt, so the holding in *Holmes v. South Carolina* is not applicable. Hence, this issue is a merely matter of state evidentiary law. *Spencer*, 5 F.3d at 763 ("[A] claim about the admissibility of evidence under state law rarely is a claim upon which federal habeas corpus relief can be granted."). Evidentiary rulings will not be considered in federal habeas "'unless [the] erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" *Barbe*, 521 F.3d at 452 (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000)). No such showing has been made here. Hence, this sub-ground suffers the same defect as the previous sub-ground: it is based solely on state law. *Chance*, 537 F.2d at 1215.

      Upon review of all of the filings in this matter and the record before the court, the court finds that the petitioner cannot demonstrate that the state trial court and appellate court misapplied federal law, or that the alleged evidentiary errors, if there even was one, were so extreme as to deny the petitioner a constitutionally fair proceeding. Therefore, he is not entitled to habeas relief. Based upon the foregoing, summary judgment should be granted to the respondent as to the petitioner's claims presented in Ground Two.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment (doc. 19) be granted.  It is also recommended that the District Court deny a certificate of appealability.  The attention of the parties is directed to the notice on the next page.

s/ Kevin F. McDonald
United States Magistrate Judge

January 11, 2016
Greenville, South Carolina

39

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).